IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


ROGER L. TRICKETT,

        Plaintiff,

v.                                            Civil Action No. 5:04-CV-133

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, Roger L. Trickett (Claimant), filed his Complaint on November 29, 2004, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on February 22, 2005.[2] Claimant filed his Motion for Summary Judgment and Brief in Support on May 16, 2005.[3] Commissioner filed her Motion for Summary Judgment and Brief in Support on June 7, 2005.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment and Brief in Support</u>.

---

[1] Docket No. 1.

[2] Docket No. 3.

[3] Docket No. 7.

[4] Docket Nos. 8 and 9.

2.    <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

C.    <u>Recommendation</u>

I recommend that Claimant's Motion for Summary Judgment be

DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the

ALJ was substantially justified in his decision.  Specifically, the ALJ properly evaluated Claimant's

obesity.

## II.  Facts

A.    <u>Procedural History</u>

On October 7, 2002, Claimant filed for Disability Insurance Benefits (DIB), alleging

disability since June 29, 2000 due to diabetes, high blood pressure, neuropathy, arthritis, chronic

bronchitis, depression and bipolar disorder.   The application was denied   initially and on

reconsideration.[5]   A hearing was held on July 15, 2003 before an ALJ.  The ALJ's decision, dated

September 26, 2003, denied the claim finding Claimant not disabled within the meaning of the Act.

Claimant requested review of the ALJ's decision, which was denied by the Appeals Council on

September 24, 2004.  This action was filed and proceeded as set forth above.

B.    <u>Personal History</u>

Claimant was 46 years old on the date of the July 15, 2003 hearing before the ALJ.  Claimant

has a four-year college education and past relevant work experience as a realty specialist.

C.    <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

_____

[5]  Claimant previously filed an application for DIB on January 2, 1999.  This claim was
initially denied on April 28, 1999, and on reconsideration on August 5, 1999.  A hearing was
held and an unfavorable decision was issued on June 29, 2000.  No further appeal was filed.

concluded that Claimant was not under a disability: June 29, 2000 through September 26, 2003.

**Veteran's Administration Medical Center, 10/18/2002, Tr. 149**
DIAGNOSIS:
1.  Bipolar affective disorder mixed.
2.  History of polysubstance abuse, alcohol and pot.
3.  Major depression

**Veteran's Administration Medical Center, 10/28/ 2002, Tr. 151**
ASSESSMENT:
1.  DM2/Microalbuminuria.
2.  Hyperlipidemia.
3.  Nicotine Dep.
4.  Depression
5.  COPD.

**Veteran's Administration Medical Center, 7/25/2002, Tr. 156**
**ASSESSMENT**:
1.  Other, mixed or unspecified drug abuse drinks homemade wine and smokes pot regularly
2.  Bipolar disorder, mixed family history of mood swings
3.  Major depression, recurrent
4.  Hypertension
5.  Tobacco use disorder
6.  Osteoarthrosis-mult site
7.  Diabetes melli /o comp typ II
8.  Pure hypercholestrolem
9.  Obesity, unsp
10. FM HX CAD-Father 63 deceased cad, sister cad dm

**Veteran's Administration Medical Center, 4/12/2002, Tr. 158**
Dx:      Bipolar affective disorder
          Major depression
          Substance Abuse–wine and pot

**Veteran's Administration Medical Center, 1/11/2002, Tr. 161**
ASSESSMENT:
1.  Non-insulin-dependent diabetes mellitus, questionable status due to patient noncompliant
    with his medications since he ran out of them.
2.  Hyperlipidemia.
3.  Hypertension, uncontrolled due to being out of the medications.
4.  Depression, being followed by mental health

DIAGNOSIS:        Bipolar affective disorder
                  Major depression

**Veteran's Administration Medical Center, 9/28/2001, Tr. 163**
DIAGNOSIS:          Bipolar affective disorder
                    Major depression


**Veteran's Administration Medical Center, 9/28/2001, Tr. 164**
DIAGNOSIS:          Major depression


**Veteran's Administration Medical Center, 8/1/2001, Tr. 165**
DIAGNOSIS:          Major depressive disorder
                    Obesity


**Veteran's Administration Medical Center, 3/8/2001, Tr. 166**
DIAGNOSIS:          Major depression


**Veteran's Administration Medical Center, 2/11/2001, Tr. 167**
ASSESSMENT:

AXIS I:         Recurrent depressive disorder.
AXIS II:        None.
AXIS III:       Hypertension.  Obesity.  Osteoarthritis, multiple sites.  Hypercholesterolemia.
Onychomycosis, Status post fracture of th left ankle with residual pain.
AXIS IV:        Psychosocial stressor level, severe.
AXIS V:         Global Assessment of Functioning Scale, 40.


**Veteran's Administration Medical Center, 2/7/2001, Tr. 168**
DIAGNOSIS: Major depressive disorder.


**Veteran's Administration Medical Center, 2/7/2001, Tr. 170**
ASSESSMENT and PLAN:
1.      Type II diabetes mellitus, stable on the present dose of metformin and glyburide.
        Continue the same.
2.      Dyslipidemia.  Slightly increased total cholesterol.  Encouraged a strict low-fat diet.
3.      Onychomycosis.  We will start Lamisil 250 mg b.i.d. once a day.  We will check liver
        function tests in four weeks.
4.      Diastolic hypertension.  We will add lisinopril 2.5 mg q.d. and the patient is to return to
        the clinic in seven to ten days for a repeat Astra and BP check.
5.      Return to the clinic six months, sooner if necessary.


**Veteran's Administration Medical Center, 11/9/2000, Tr. 172**
DIAGNOSIS: Major depression
                    Obesity
                    Diabetes mellitus
                    Hypertension
                    Hyperlipidemia


4

COPD
S/P fracture of left ankle with residual pain and slow healing process

## **Residual Functional Capacity Assessment (Mental), Dr. Joseph Kuzniar, 12/13/2002, Tr. 186-190**

A.     UNDERSTANDING AND MEMORY

The ability to remember locations and work-like procedures; to understand and remember very short and simple instructions and detailed instructions: no evidence of limitation.

B.     SUSTAINED CONCENTRATION AND PERSISTENCE

To carry out very short and simple instructions: no evidence of limitation.
To carry out detailed instructions: not significantly limited.
To maintain attention and concentration for extended periods: moderately limited.
To perform activities within a schedule, maintain regular attendance and be punctual: moderately limited.
To sustain an ordinary routine without special supervision: no evidence of limitation.
To work in coordination with or proximity to others without being distracted: moderately limited.
To make simple work-related decisions: no evidence of limitation.
To complete a normal work-day and work-week without interruptions from psychologically based symptoms: moderately limited.

C.     SOCIAL INTERACTION

To interact appropriately with the general public: not significantly limited.
To ask simple questions or request assistance: no evidence of limitation.
To accept instructions and respond appropriately to criticism: moderately limited.
To get along with co-workers: moderately limited.
To maintain socially appropriate behavior: not significantly limited.

D.     ADAPTION

To respond appropriately to changes in the work setting: moderately limited.
To be aware of normal hazards and take appropriate precautions: no evidence of limitation.
To travel in unfamiliar places or use public transportation: not significantly limited.
To set realistic goal and make plans independently of others: not significantly limited.

## **Psychiatric Review Technique, 12/13/2002, Tr. 191-204**

Affective Disorders: sleep disturbances, decreased energy, difficulty concentrating, bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.

Substance Addiction Disorders: medically determinable impairment is present that does not precisely satisfy the diagnostic criteria.

Functional Limitations:
      Restriction of Activity of Daily Living, mild.
      Difficulties in Maintaining Social Functioning, moderate.
      Difficulties in Maintaining Concentration, Persistence, or Pace, moderate.
      Episodes of Decompression of extended duration, none.

## Residual Functional Capacity Assessment (Physical), 2/6/2003, Tr. 205-212

Exertional Limitations:
      occasionally lift/carry: 50 pounds
      frequently lift/carry: 25 pounds
      stand/walk: about 6 hours in an 8-hour workday
      sit: about 6 hours in an 8-hour workday
      push/pull: unlimited

Postural Limitations: none established.
Manipulative Limitations: none established.
Visual Limitations: none established.
Communicative Limitations: none established.
Environmental Limitations: none established.

## Mental Residual Functional Capacity Assessment, 2/6/2003, Tr. 214-218

The ability to remember locations/work-like procedures, not significantly limited.
The ability to understand and remember very short and simple instructions, not significantly limited.
The ability to understand and remember detailed instructions, moderately limited.
The ability to carry out very short and simple instructions, not significantly limited.
The ability to carry out detailed instructions, moderately limited.
The ability to maintain attention and concentration for extended periods, moderately limited.
The ability to perform activities within a schedule, not significantly limited.
The ability to sustain in ordinary routine without special supervision, not significantly limited.
The ability to work in coordination with or proximity to others, moderately limited.
The ability to make simple work-related decisions, not significantly limited.
The ability to complete a normal work-day and work week without interruptions from psychologically based symptoms, moderately limited.
The ability to interact appropriately with the general public, not significantly limited.
The ability to ask simple questions or request assistance, not significantly limited.
The ability to accept instructions and respond appropriately to criticism, moderately limited.
The ability to get along with coworkers or peers without distracting them, moderately limited.
The ability to maintain socially appropriate behavior, not significantly limited.
The ability to respond appropriately to change in the work setting, not significantly limited.
The ability to be aware of normal hazards and take appropriate precautions, not significantly limited.
The ability to travel in unfamiliar places, no evidence of limitation.
The ability to set realistic goals or make plans independently of others, no evidence of limitation.

**Psychiatric Review Technique Form, 2/6/2003, Tr. 219-232**
Affective Disorders:

> Disturbance of mood, depressive syndrome: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; decreased energy; feelings of guilt or worthlessness; thoughts of suicide.

Functional Limitations:

> Restriction of Activities of Daily Living, mild.
> Difficulties in Maintaining Social Functioning, moderate.
> Difficulties in Maintaining Concentration, Persistence, or Pace, moderate.
> Episodes of Decompensation, none

**Physical Residual Functional Capacity Assessment, 2/6/2003, Tr. 233-241**
Exertional Limitations:

> Occasionally lift/carry: 50 pounds.
> Frequently lift/carry: 25 pounds.
> Stand and/or walk, about 6 hours in an 8-hour workday.
> Sit: about 6 hours in an 8-hour workday.
> Push and/or pull" unlimited.

Postural Limitations:

> Climbing: occasionally
> Balancing, stooping, kneeling, crouching, crawling: frequently.

Manipulative Limitations, none established.
Visual Limitations, none established.
Communicative Limitations, none established.
Environmental Limitations:

> Extreme cold, extreme heat: avoid concentrated exposure.
> Wetness, Humidity, Noise, Vibration, Fumes: unlimited.
> Hazards: avoid concentrated exposure.

**Clarksburg Veterans Administration Medical Center, Radiology Diagnostic Report, 6/17/2003, Tr. 247**
Impression: No evidence of an active disease process in the chest at this time.

**Clarksburg Veterans Administration Medical Center, 6/10/2003, Tr. 249**
ASSESSMENT:
1. DM2/Microalbuminuria/Neuropathy
2. Hyperlipidemia
3. Hypertension
4. Nicotine Dep
5. Depression
6. COPD

**Clarksburg Veterans Administration Medical Center, 2/3/2003, Tr. 255**
DIAGNOSES:
1.      Bipolar affective disorder, depressed.
2.      Polysubstance abuse, alcohol and pot.
3.      Major depressive disorder.
4.      Other diagnoses as per th medical record.
5.      Global assessment of functioning is 45.


D.      Testimonial Evidence

1. Claimant

        Testimony was taken at the hearing from Claimant, who testified as follows

(Tr. 260-310):

        A       Well, as I indicated earlier, I have multiple medical problems but my

diabetes is one that causes fatigue and - -

        Q       Okay.  Let's talk about the diabetes, okay?

        A       Okay.

                                *               *               *

        Q       How about exercise?  Do you get exercise?

        A       Not too much, sir.

        Q       Okay.  I mean one of the problems with people that, you know, the doctors - - the

people that have diabetes, they frequently tell them to go out and exercise because that helps

them control their blood sugar levels.  Has the doctor talked to you about that?

        A       They talked to me about that.

        Q       Okay.

        A       Did they - - I mean do you try to do some types of exercise?

        A       Normally I'm too sick to do it, to do any type of exercise.  I don't get too much

8

exercise because all the medications I take make me groggy and generally just don't feel good.

Q        Do you try to get out and get some exercise?

A        I don't get out too often.  I walk to my mailbox and I get out once a month to the grocery store.

Q        So you take your medications, you monitor your blood sugar levels, what else does the doctor tell you to do for your diabetes?  And I guess he tells you to try to exercise but you don't do that.

A        I just watch what I eat.

Q        Well, does he suggest you try to lose weight?

A        Yes.

Q        And has he ever had you on a diet?

A        I've tried.

Q        When was the last time that you were on a diet?

A        I still try to follow their eating recommendations.  Instead of eating big meals eat smaller amounts.

*               *               *

A        Well, with the diabetes, I have leg cramps bad from that and blurred vision from time to time fairly on a daily basis now I used to read.  I can't read that much anymore because my eyes go blurry and I have leg cramps at night from the diabetes.  But my breathing, I can - - I've tried to quit smoking.  I've cut them down and I do two different inhalers for the breathing difficulty which they call chronic bronchitis.

*               *               *

9

Q    How often do you get cramps in your legs?

A    Every night.   I have great trouble sleeping and they give me a drug for it called amitriptyline.

Q    It's to help you sleep, right?

A    Well, it's for the leg cramps, yes.

Q    Okay.

A    But it also makes me very groggy in the mornings.   I mean I have a hard time getting - - waking up when I do them but I can't - - I still don't sleep well because of the leg cramps.

Q    Well, what causes the leg cramps?

A    The diabetes.  I have some nerve - - what they called neuropathy in my extremities.

Q    And what does that cause?  I mean how - -

A    I mean my feet hurt if I'm on my feet for a very long time and I have the leg cramps at night.  And I guess also the blurred vision is caused.

Q    How often do you get blurred vision?

A    Pretty much on a daily basis although I - - they check my eyes every year and they're talking about starting to go to an every six month check on my eyes.

Q    Well, when you have the blurred vision, how long does it last?

A    For an hour or two.  I know I don't read much anymore because of that.

                        *          *          *

A    Because I don't - - I have to take all my medicines then.  And usually I'm groggy

all morning. It takes me quite a lot of caffeine to try and get woke up. And then I - - by noon, early afternoon, I usually fall asleep for a couple hours.

Q       Do you think that's why you have trouble sleeping at night?

A       No. I've tried to stay up but I'm just groggy and so tired from the combination of medication. I have blacked out several times. And I've taken that up with the VA and they've told me not to - - when I got to bend over be very careful and mainly it's when I go to stoop over to pick up something, I've blacked out about three times within the past year and it's a combination of the medicines, all the medicines I'm doing is what they indicate. That I usually sleep a couple hours in the afternoon. Then I get up and check my blood sugar, try to eat something again. I used to read. I don't read much anymore. I have trouble focusing and concentrating.

Q       Now why don't you go out and try to walk?

A       It hurts me to walk. I have a metal plate in my leg and the diabetes. I have feet pain a lot and leg pain. I walk to my mailbox a couple times a week. I don't even do that every day.

*                *                *

Q       When's the last time you cut your lawn?

A       I cut it once earlier this year but it took me about three days to do it.

Q       Do you have a power mower or a rider mower? How is it - -

A       I have a push power one but I have great difficulty doing that anymore.

Q       Why is that? What bothers you about using that?

A       Well, my legs and feet for one thing and then my breathing for another. And the

general grogginess and tiredness that I endure from the - - all the medicines that I take.

*          *          *

A       I used to like to go hunting and fishing and things of this nature but I'm just not up to it.

Q       When did you stop doing those things?

A       About '98.

*          *          *

Q       Okay.  Now you told me that you said you haven't been hunting or fishing since '98.  Is that correct?

A       Well, I might have gone fishing since then a time or two but not very often do I go out and do those type of things.

Q       Do you have friends that you go fishing or hunting with?

A       Well, they still go but I don't because I don't feel like it.  I did go fishing maybe in April once but it just didn't work out very good because of my legs and my feet.

Q       When your children come over, what do they do?  How do you entertain them or -

A       That's difficult.  I believe that's one reason they don't come to see me too often because I don't have the wherewithal to do anything with them anymore financially or anything.  They're used to, you know, running and doing things.   I used to take them swimming and camping and everything but I try to play games with them.

Q       What type of games, board games or - -

A       Cards or checkers and I do have a computer which has some games on for them.

12

Q        Do you use the computer?  Do you use e-mails or do search or research or the Internet?

A        Not too much anymore.  It just hurts my eyes to look at it, the screen.

                              *                *                *

Q        How about standing?  Do you have any difficulty standing like standing at a counter doing dishes or working - -

A        Yes, I do.  It hurts my legs, and my feet hurt and - -

Q        How long?

A        - - and I can't stand very long at a time because I pay for it later.  My feet just kill me.

Q        When you say your feet are you talking about the soles of your feet or your - -

A        Yes.

Q        What's your - - I mean do you have any problems with your feet other than pain in your feet?

A        Well, the neuropathy, I'm losing some feelings in my feet  but I do still have pain in the soles of my feet and the leg cramps.

                              *                *                *

Q        Okay.  And you say you don't drive much.  You said that several times, why?

A        Well, my vision is blurry from time to time.

Q        Does that happen daily you say?

A        Yes.

Q        How long does it last when it kicks in?

A       Maybe about an hour or two hours my vision is blurry.

Q       Is that a function of blood sugar?

A       From what I understand, it's a symptom of the diabetes.

Q       Is there anything we haven't covered?  I wanted to ask you about - - you mentioned concentration - -

A       Concentration - -

Q       How have you noticed this to be impaired?

A       I just have difficulty remembering and concentrating and focusing on anything.  And I don't - - I used to love to read.  I used to be pretty sharp but I just can't seem to function like I used to and I think it's, you know, a lot of the medication I take.

Q       Do you not - -

A       I just remain sort of groggy.

Q       - - remember what you're reading or not being able to actually - -

A       Well, my eyes blur is one thing but the other thing is I just can't focus right.  I mean my driver's license expired.  I had no idea.  I went and got them renewed.  I have a handicap permit in my car right now that says June of 2003.  Well, I don't remember getting nothing in the mail about renewing.  Maybe I did, maybe I threw it away.  That's one reason I - - my mother helps me and I go to the vet center to the social workers to try to get some help dealing with the government and the papers and family court.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 310-319):

Q       For the Claimant's past relevant work, would you identify the jobs from a standpoint, jobs he's had in the last 15 years from a standpoint of the - - how the job would be characterized in the <u>Dictionary of Occupation Titles</u>, also the skill level and the exertional level?

A       Yes, Your Honor.  From 1986 to 1998, he worked for the Corps of Engineers as he described as a real estate specialist.  According to the DOT, that work would be categorized as a property utilization officer, light and skilled.

Q       All right.  The - - now he mentioned that he also did some work as a real estate agent on a part-time basis.  What would you characterize that real estate agent?

A       Yes, Your Honor, a real estate sales agent according to the DOT is light and skilled.

Q       Basically the same as the - - I mean the same skill level and the exertional level at the job with the Corps?

A       Yes, Your Honor.

Q       Any indication of any other types of work in the last 15 years that you found in the file?

A       No, Your Honor.

Q       All right.  I want you to assume - - well, assuming that the Claimant would have the ability to do medium unskilled work, would the Claimant be able to do any of his past relevant work?

A       Yes, Your Honor.

Q       Even if - -

A       Medium unskilled work?

15

Q    Right.

A    And so he's not able to do skilled work?

Q    Right.

A    He would not be able to do his past relevant work.

Q    Okay.  I want you to assume a hypothetical individual the same age, education, and work experience as the Claimant would have the ability to do medium work, would not be able to do jobs that would require any complex task, would be - - not be able to do any work that required work in extremes of heat or cole for long periods of time nor would be able to do any work around dangerous machinery or unprotected heights for long periods of time, no jobs that would require high rates of production such as assembly line work or high quota jobs such as telemarketing and sales.  Would there be any unskilled jobs that such a hypothetical person could do in the local or national economy?

A    At the medium level, Your Honor?

ATTY    Right.

ALJ    And while you're looking there, Counsel do we have any functional capacity statements other than from the state agency doctors?

ATTY    Not to my knowledge.

ALJ    Okay.  That was the impression that I had from looking in there.

ATTY    My concern, too, Your Honor.

ALJ    Okay.

ATTY    The VA doesn't do such as you know.

ALJ    Right.

VE          Yes, Your Honor, I would find in the local regional economy as 20 percent of all unskilled jobs in the State of West Virginia based on the Bureau of Labor Statistics.  There would be the work of a packer.  In the local regional economy there would be 66 jobs, in the national economy 102,000 jobs.  There would be the work of an assembler.  In the local regional economy there would be 74 jobs, in the national economy 159,700 jobs.  There would be the work of a commercial cleaner.  In the local regional economy there would be 2,330 jobs, in the national economy 1,638,000 jobs.

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q          All right.  I'm going to ask you another hypothetical at the light functional capacity with the same restrictions that I gave you at medium but further limiting the jobs to just simple one to three step tasks as opposed to no complex task.  Would there be any unskilled jobs that such a hypothetical person could do in the local or national economy?

A          Yes, Your Honor.  There would be the work of an assembler.  And at this time at the light level there would be 291 jobs in the local regional economy and 495,200 jobs in the national economy.  There would be the work of a mail clerk, and that would be working in private industry as opposed to working for the Postal Service, and there would be 39 jobs in the local regional economy and 51,300 jobs in the national economy.  There would be the work of a library clerk.  In the local regional economy there would be 32 jobs.  In the national economy 33,200 jobs.

Q          All right.  I'm going to ask you the same hypothetical but at the sedentary level with the  - - for the limitation that the Claimant, they hypothetical individual would be limited to

standing or walking for no more than two hours in an eight-hour day and would not be able to stand for more than half-hour at a time nor walk for more than 15 minutes at a time but could do the total of at least two hours of standing or walking in an eight-hour day. Would there be any unskilled jobs at the sedentary level?

A       Yes, Your Honor. There would be the work again as an assembler at the sedentary level. There would be 62 jobs in the local or regional economy, 103,800 in the national economy. There would be work of - - as an interviewer. In the local regional economy there would be 35 jobs, in the national economy 22,700 jobs. There would be the work of a surveillance system monitor. In the local regional economy there would be 7 jobs, in the national economy 5,460 jobs.

Q       All right. I'll ask you another hypothetical at the sedentary level with the additional restrictions that the hypothetical individual would be off task outside the normal breaks and lunch breaks for an additional hour a day in that the individual would either have to lay down or would not be able to complete the work functions. Would there be any unskilled jobs that such a hypothetical person could do at the local or national economy - -

A       There would be no jobs for - - excuse me.

Q       - - in the local or national economy.

A       There would be no jobs for this hypothetical individual, Your Honor.

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

18

- Polysubstance abuse.  (Tr. 149).

- Obesity.  (Tr. 156).

- Has a driver's license.  (Tr. 268).

- Drives once a month.  (Tr. 268).

- Goes to the grocery store once a month.  (Tr. 268, 291-292).

- Smokes two packages of cigarettes a day.  (Tr. 281, 283).

- Takes naps every day (approximately two hours).  (Tr. 289).

- Prepares his meals.  (Tr. 290).

- Does his laundry.  (Tr. 290).

- Watches "some" television.  (Tr. 292).

- Visits his friends and his friends visit him.  (Tr. 293).

- Attends the church services once a month.  (Tr. 296).

- Can walk on level ground without resting: 100 feet.  (Tr. 297).

- Can stand without having to sit down or move: 15 minutes.  (Tr. 298).

- Washes his dishes.  (Tr. 299).

- Can walk or stand less than two hours a day.  (Tr. 299).

- Can carry a gallon of milk in each hand.  (Tr. 299).

- Makes 4-5 gallons of wine.  (Tr. 301).

## III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence.

Specifically, Claimant asserts that the ALJ erred in failing to evaluate Claimant's obesity at every

level of the sequential analysis.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly evaluated Claimant's obesity.

B.   The Standards.

1.   Summary Judgment.   Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.   Judicial Review.   Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.   Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.   Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical

or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled,

the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

complete record." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).

10.    Obesity. An ALJ's failure to specifically mention obesity was not reason enough to remand the proceeding back to the Commissioner. Rutherford v. Barnhart, 399 F.3d 546, 552-553 (3rd Cir. 2005); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004). Even though the ALJ did not mention the claimant's obesity in his decision, the ALJ did state that he had reviewed the record, which included doctor's opinions of the claimant's obesity. Therefore, the claimant's obesity "was factored indirectly into the ALJ's decision as part of the doctor's opinion." Skarbek v. Barnhart, 390 F.3d at 504.

C.    Discussion

The sole issue raised by Claimant in this case is whether the ALJ erred because he failed to evaluate Claimant's obesity throughout the disability determination. The Commissioner contends that the ALJ properly considered the evidence as a whole and, therefore, properly evaluated Claimant's obesity.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

In this case, Claimant alleged that he was disabled as a result of diabetes, high blood pressure, neuropathy, arthritis, bronchitis, depression and bipolar disorder. (Tr. 13, 108). Claimant never alleged that his weight caused him either physical or mental functional limitations. Claimant also never alleged that his weight contributed to his alleged inability to work. It should be noted that Claimant argues that the ALJ erred because he failed to consider Claimant's weight throughout the disability determination, although he did not raise obesity as an impairment or limitation until this appeal.

Claimant cites Social Security Ruling ("SSR") 02-1(p) for the proposition that, because the ALJ "made no attempts to ascertain the effects of Mr. Trickett's obesity on his other impairments and limitation" and did not "evaluate whether or not Mr. Tricket's [sic] obesity was a severe impairment," the ALJ's decision should be reversed and this case should be remanded "for proper consideration." Pl.'s Br. at 6. Claimant's argument is misplaced. Obesity is not in and of itself a disability. See Social Security Ruling 02-1p: "Titles II and XVI: Evaluation of Obesity," 2000 WL 628049 (S.S.A); 20 C.F.R. Pt. 404, Subpt. P, Part A 1.00 B(2)(d). An ALJ should consider whether obesity, in combination with other impairments, prevents Claimant from working. Id. The Court in Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3rd Cir. 2005), held that failure to explicitly address a claimant's obesity did not warrant remand. Additionally, the Court

in <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 504 (7th Cir. 2004), stated that, when an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the claimant, his obesity is understood to have been factored into their decision.

In the instant case, the ALJ stated that he reviewed all evidence and relied on this evidence to determined that Claimant was capable of light work. (Tr. 28). The ALJ correctly cited standards for determining medical severity of Claimant's alleged impairment. He acknowledged that the regulations require that, if a severe impairment exists, it must be considered in the remaining steps of the five-step analysis. (Tr. 14, 24, 29). As the ALJ repeatedly stated that he considered the entire medical record carefully (Tr. 24, 25, 28, 29), he was clearly aware of Claimant's obesity and also noted Claimant's fluctuating weight, but did not spell out whether this had any bearing on his determination. (Tr. 12-31). Claimant himself, however, neglected to mention how his obesity affected his ability to work when asked by the ALJ to describe why he was unable to work. (Tr. 303-304).

In reviewing the decision of the ALJ, the Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence. <u>Hays v. Sullivan</u>, 907 F.2d at 1456. In the instant case, the ALJ's decision considered all alleged impairments; sufficiently, albeit indirectly, accounted for Claimant's obesity; and, determined that it neither rose to the level of medical severity nor imposed a functional limitation on light work. Moreover, Claimant's counsel failed to specify in her motion how Claimant's weight contributed to his alleged disability. Therefore, Claimant failed to establish grounds for remand.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment

be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly evaluated Claimant's obesity.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

/s/ James E. Seibert
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE